# 16 MAG 6547 ORIGINAL

APPROVED: _____
GEORGE D. TURNER / SHAWN G. CROWLEY
Assistant United States Attorneys

BEFORE:   THE HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**

        - v. -                    :    Violations of
                                       21 U.S.C. §§ 963 & 959;
VLADIMIR LYUBISHIN, SR., and      :    18 U.S.C. §§ 924(o),
VLADIMIR LYUBISHIN, JR.,               2332g, 3238 & 2
                                  :
        Defendants.
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MICHAEL CONNOLLY, being duly sworn, deposes and says that
he is a Special Agent of the Drug Enforcement Administration
("DEA"), and charges as follows:

## COUNT ONE
### (Narcotics Importation Conspiracy)

        1.   From at least in or about the fall of 2015, up to and
including in or about October 2016, in the Southern District of
New York and elsewhere, and in an offense begun and committed
out of the jurisdiction of any particular State or district,
VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the
defendants, at least one of whom is expected to be first brought
to and arrested in the Southern District of New York, and
whose point of entry into the United States is expected to be in the
Southern District of New York, and others known and unknown,
intentionally and knowingly did combine, conspire, confederate,
and agree to violate the narcotics laws of the United States.

        2.   It was a part and object of the conspiracy that
VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the
defendants, and others known and unknown, would and did
distribute, and possess with intent to distribute, a controlled
substance, to wit, five kilograms and more of mixtures and

substances containing a detectable amount of cocaine, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States from a place outside thereof, in violation of Sections 812, 959(a), 959(d), 960(a)(3), 960(b)(1)(B), and 963 of Title 21, United States Code.

### Overt Acts

3.    In furtherance of the conspiracy, and to effect the illegal object thereof, VLADIMIR LYUBISHIN, SR. ("LYUBISHIN, SR.") and VLADIMIR LYUBISHIN, JR. ("LYUBISHIN, JR."), the defendants (together, the "LYUBISHINS"), and others known and unknown, committed the following overt acts, among others:

a.    On or about December 5, 2015, a co-conspirator ("CC-1") of LYUBISHIN, SR. and LYUBISHIN, JR., met with a DEA confidential source ("CS-1") in a particular country ("Country-1"), to discuss supplying weapons to CS-1 and his/her associates for the protection of cocaine shipments into the United States (the "Weapons Transaction").

b.    On or about June 22, 2016, the LYUBISHINS and CC-1 met with CS-1 and a second DEA confidential source ("CS-2") in a particular country ("Country-2") to discuss the Weapons Transaction.

c.    On or about June 24, 2016, CC-1 met with CS-1 in Country-1 to discuss the Weapons Transaction.

d.    On or about August 2, 2016, the LYUBISHINS met with CS-1, CS-2, and a third DEA confidential source ("CS-3") in a particular country ("Country-3") to discuss the Weapons Transaction.

e.    On or about August 19, 2016, the LYUBISHINS met with CS-1, CS-2, and CS-3 in Country-3 to discuss the Weapons Transaction, during which meeting the LYUBISHINS showed various types of military-grade weapons to the confidential sources.

f.    On or about September 16, 2016, LYUBISHIN, JR. participated in a telephone call with CS-1 and CS-3, during which call LYUBISHIN, JR. stated, in substance and in part, that the LYUBISHINS were prepared to supply anti-aircraft missiles to the confidential sources and their associates as part of the Weapons Transaction.

g.    On or about September 17, 2016, LYUBISHIN, JR. sent text messages to CS-1 stating, in substance and in part, that the LYUBISHINS were offering to supply three particular types of anti-aircraft missiles as part of the Weapons Transaction.

(Title 21, United States Code, Sections 963 and 959(d); Title 18, United States Code, Section 3238.)

**COUNT TWO**
**(Attempted Narcotics Importation)**

4.    From at least in or about the fall of 2015, up to and including in or about October 2016, in the Southern District of New York and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, and whose point of entry into the United States is expected to be in the Southern District of New York, intentionally and knowingly did attempt to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, from a place outside thereof, in violation of Sections 959(a), 959(d), 960(a)(3), 960(b)(1)(B), and 963 of Title 21, United States Code.

5.    The controlled substance involved in the offense was five kilograms and more of a mixture and substance containing a detectable amount of cocaine, in violation of Sections 812, 960(a)(3), and 960(b)(1)(B) of Title 21, United States Code.

(Title 21, United States Code, Sections 963 and 959(d); Title 18, United States Code, Section 3238.)

**COUNT THREE**
**(Conspiracy to Aid and Abet the Possession of Firearms**
**in Furtherance of a Drug Trafficking Offense)**

6.    From at least in or about the fall of 2015, up to and including in or about October 2016, in the Southern District of New York and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, at least one of whom is expected to be first brought

to and arrested in the Southern District of New York, and others known and unknown, did combine, conspire, confederate, and agree to aid and abet the use and carrying of firearms, including machineguns, during and in relation to, and the possession of firearms, including machineguns, in furtherance of, a drug trafficking crime for which they may be prosecuted in a court of the United States, namely, the narcotics importation offense charged in Count One.

### Overt Acts

7.    In furtherance of the conspiracy and to effect the illegal object thereof, VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, and others known and unknown, committed the overt acts alleged in Paragraph 3 above, among others, which acts are realleged and incorporated as if set forth here in full.

(Title 18, United States Code, Sections 924(o), 2, and 3238.)

### COUNT FOUR
### (Conspiracy to Acquire and Transfer Anti-Aircraft Missiles)

8.    From at least in or about the fall of 2015, up to and including in or about October 2016, in the Southern District of New York and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree to violate Section 2332g of Title 18, United States Code.

9.    It was a part and an object of the conspiracy that VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, and others known and unknown, would and did knowingly acquire, transfer directly and indirectly, receive, possess, and export (1) an explosive and incendiary rocket and missile that is guided by a system designed to enable the rocket and missile to seek and proceed toward energy radiated and reflected from an aircraft and toward an image locating an aircraft, and otherwise direct and guide the rocket and missile to an aircraft, and (2) a device designed and intended to launch and guide said rocket and missile, in violation of Sections 2332g(a)(1)(A) and (B) of Title 18, United States Code.

4

Overt Acts

10.  In furtherance of the conspiracy and to effect the illegal object thereof, VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, and others known and unknown, committed the overt acts alleged in Paragraph 3 above, among others, which acts are realleged and incorporated as if set forth here in full.

(Title 18, United States Code, Sections 2332g(a)(1)(A) and (B), (b)(1), (b)(4), (b)(5), (c)(1), and 3238.)

The bases for my knowledge and the foregoing charges are as follows:

11.  I have been a DEA Special Agent since 2009.  I am currently assigned to the DEA Special Operations Division's Bilateral Investigations Unit, which focuses on international criminal activities.  During my time as a DEA Special Agent, I have become familiar with some of the ways in which narcotics traffickers operate, and have participated in numerous investigations involving international drug trafficking.  I have been personally involved in the investigation of this matter. This affidavit is based on my communications with other law enforcement officers and other individuals, and on my review of various reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all of the facts that I have learned during the course of the investigation.  Where the contents of communications with others and statements by others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Overview**

12.  As set forth in greater detail below, since the fall of 2015, VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, and CC-1 have conspired to supply military-grade weapons to three individuals whom they understood to be associates of a Mexican drug trafficking organization (the "DTO"), for the purpose of protecting the DTO's cocaine shipments into the United States.  Those three purported

associates of the DTO are, in fact, DEA confidential sources ("CS-1," "CS-2," "CS-3," and, collectively, the "CSes"[1]).

13.    Over the past year, the LYUBISHINS and CC-1 have engaged in a series of recorded meetings and telephone calls, as well as text and audio messages, with the CSes to arrange the sale of weapons to the CSes, *i.e.*, the Weapons Transaction.  In the fall of 2015, CS-1 was introduced to CC-1, who acted as a broker for the Weapons Transaction.  See infra ¶ 16.  In December 2015, CC-1 met CS-1 in Country-1, and they discussed arranging the Weapons Transaction.  See infra ¶ 18.  Between December 2015 and June 2016, CC-1 continued communicating with CS-1 and lined up sellers for the Weapons Transaction: the LYUBISHINS.  See infra ¶ 19.  In late June 2016, at a meeting in Country-2, CC-1 introduced the LYUBISHINS to CS-1 and CS-2, and the parties discussed the terms of the Weapons Transaction.  See infra ¶ 20.

14.    The CSes began communicating directly with the LYUBISHINS, and in early August 2016, the CSes met the LYUBISHINS in Country-3 to continue discussing the terms of the Weapons Transaction.  See infra ¶¶ 23-25.  On or about August 19, 2016, the CSes met again with the LYUBISHINS in Country-3, and the LYUBISHINS took the CSes to two warehouses to show the CSes their stockpiles of military-grade weapons, including machineguns, missiles, and amphibious assault vehicles.  See infra ¶¶ 26-29.  At that meeting, the LYUBISHINS also provided the CSes with an invoice reflecting that, in the initial phase of the Weapons Transaction, the LYUBISHINS would supply the CSes with over 5,000 machineguns at a total price of €2,000,000.  See infra ¶ 29(b).  In mid-September 2016, during a recorded call and subsequent text messages, the LYUBISHINS offered to supply the CSes with three particular types of anti-aircraft missiles as part of the Weapons Transaction.  See infra ¶ 30.

---

[1] CS-1 and CS-2 have been paid DEA sources since 2014 and have each worked on several investigations.  During that time, information provided by CS-1 and CS-2 has proven reliable and has been corroborated by independent evidence, including audio/video recordings and other source information.

CS-3 has been a paid DEA source since 1996 and has worked on numerous investigations.  During that time, information provided by CS-3 has proven reliable and has been corroborated by independent evidence, including audio/video recordings and other source information.

15.    At various points during their meetings, calls, and other communications with the LYUBISHINS and CC-1, as described below, the CSes explained that the weapons supplied to the CSes would be used by the DTO to protect its cocaine shipments into the United States.

## The Investigation

16.    Based on my communications with CS-1 and my review of DEA reports, I have learned the following:

a.    In or about the fall of 2015, CS-1 was introduced to an associate of CC-1 ("CC-2").  During telephone conversations with CC-2, CS-1 informed CC-2, in substance and in part, that CS-1 represented a client seeking to purchase military-grade weapons.  In or about late September 2015, CS-1 sent a text message to CC-2 listing weapons that CS-1's client was seeking to acquire ("Weapons List-1"), including assault rifles, machineguns, rocket-propelled grenades ("RPGs"), hand grenades, and anti-tank missiles.

b.    On or about October 12, 2015, CS-1 met with CC-2 in a particular country ("Country-4").  At that meeting, CC-2 informed CS-1, in substance and in part, that CC-2 represented a certain associate, who has since been identified as CC-1, see infra ¶ 17.  CC-2 told CS-1 that CC-2 would inform CC-1 that CS-1 was seeking to arrange a weapons transaction.  CC-2 also provided CS-1 with a telephone number for CC-1 (the "CC-1 Number").  CS-1 requested that CC-2 transmit Weapons List-1 to CC-1.

## October and November 2015: CC-1 Communicates with CS-1 and Sends Images of Weapons

17.    Based on my communications with CS-1 and my review of DEA reports, consensually recorded telephone calls, and text and audio messages exchanged between CC-1 and CS-1 via a messaging application for cellphones (the "Application"), I have learned the following:

a.    In or about late October 2015, CS-1 contacted the CC-1 Number, and began communicating with CC-1.  Over the ensuing weeks, at the direction of the DEA, CS-1 maintained contact with CC-1 through a series of recorded telephone calls, as well as text and audio messages via the Application.  CS-1 posed as an associate of a Mexico-based drug cartel, the DTO. In the course of their communications in the fall of 2015, CS-1 informed CC-1 that the DTO needed weapons to protect shipments

of cocaine that the DTO was transporting from Mexico into the United States.   The communications between CC-1 and CS-1 included the following, in substance and in part:

   i.   On or about October 29, 2015, during a recorded telephone call, CS-1 stated that he/she was calling about "the order for Mexico, the weapons."[2]   CS-1 explained that the transaction would not be "legit," and that the buyer did not have any importation documents.   CC-1 conveyed that he had previously engaged in multiple such "unofficial" weapons deals. CS-1 referred to Weapons List-1, and CC-1 confirmed that he had received Weapons List-1.   CC-1 indicated that he would start organizing the Weapons Transaction, and that he anticipated engaging associates who were "Russians."   CS-1 informed CC-1 that the buyer is a "cartel" in Mexico.   CC-1 stated:   "I understand your conditions completely."   CC-1 and CS-1 agreed to use the Application to continue communicating regarding the Weapons Transaction.

   ii.   Later that day (October 29, 2015), CC-1 sent multiple audio messages to CS-1 via the Application.   In those audio messages, CC-1 informed CS-1 that CC-1 was in contact with a prospective "seller" for the Weapons Transaction, and referenced "the manufacturer, in Moscow."   CC-1 indicated that he would serve as a "consultant" in the Weapons Transaction in exchange for a "consultancy fee" equal to "20, 25 percent" of the contract price.

   iii.   On or about November 5, 2015, CC-1 and CS-1 exchanged audio messages via the Application.   In those audio messages, CC-1 asked CS-1 to specify "the final destination of the product you need," and the "minimum prices for AK-47," as "the seller is asking."   CS-1 responded that the final destination was Mexico, and provided prices that the buyer was willing to pay for AK-47 assault rifles.

   iv.   On or about November 12, 2015, CC-1 sent an audio message to CS-1 via the Application, stating that he planned to travel to Russia with an associate to inspect the "factory."   Based on my training, experience, and participation

---

[2] All quotations in this Complaint drawn from telephone calls, audio messages, and meetings are based on a review of audio recordings, video recordings, and/or preliminary draft transcripts and translations, and are thus subject to revision upon the preparation of finalized transcripts and translations.

in this investigation, I believe that "factory" was a reference to a weapons manufacturing facility in Russia.

       v.   On or about November 20, 2015, CC-1 sent CS-1, via the Application, a series of what appear to be pages from a weapons catalogue, depicting images of weapons and listing their specifications (such as caliber, weight, and range).  CC-1 indicated that the depicted weapons represented the types of weapons that were available for purchase from the sellers. Below are several examples of the images sent by CC-1, which included headings identifying the type of weapon:





### December 5, 2015: Meeting with CC-1

18.  On or about December 5, 2015, at the DEA's direction, CS-1 met with CC-1 (and an associate) in Country-1 (the "December 2015 Meeting").  Based on my communications with CS-1 and my review of DEA reports, I have learned that the following occurred during the December 2015 Meeting, in substance and in part:

       a.   CS-1 reiterated that he/she represented a Mexican cartel that needed military-grade weapons.

       b.   CC-1 confirmed that he could arrange for the sale of military-grade weapons to CS-1 and his/her associates.

**January-June 2016: CC-1 Remains in Contact with CS-1 and Sends a
Weapons Pricing List on Behalf of the Defendants**

19. Based on my communications with CS-1 and my review of
DEA reports, consensually recorded telephone calls, and text and
audio messages exchanged between CC-1 and CS-1 via the
Application, I have learned the following:

a. In the months following the December 2015
Meeting, CC-1 continued communicating with CS-1 about, among
other things, the Weapons Transaction, as well as the narcotics
trafficking business of the DTO.

b. On or about January 1, 2016, CC-1 and CS-1
exchanged text and audio messages regarding the Weapons
Transaction. In the course of those messages, CS-1 informed CC-
1 (via text message) that "we have this month big shipment
coming to Europe." CS-1 elaborated (via audio message) that the
"product" was "from Colombia and Mexico." CC-1 and CS-1 then
engaged in the following exchange:

CC-1 (text):    Ah ok. Drg ?

CS-1 (text):    Lol

CS-1 (text):    Yes

CS-1 (audio):   Yeah, the white one, the good
                stuff, very good.

CC-1 (text):    Ok.

CS-1 (audio):   Did you check with your friend,
                the one you told me about it?

CC-1 (text):    Brother  i  ca[n]  do  this
                business too. And i spoke with
                my father's friend. He ask me
                where it come from and i told
                him colombia or mexico . . . .

Based on my training, experience, and participation in this
investigation, I believe that, in the foregoing exchange, CC-1
acknowledged that he understood that CS-1's associates were
engaged in trafficking narcotics ("Drg"), specifically cocaine
("the white one") from Colombia or Mexico, and that CC-1 also
indicated his interest in participating in the DTO's cocaine
trafficking activities ("Brother i ca[n] do this business too").

10

c.    On or about April 15, 2016, CC-1 sent CS-1, via text message, a photograph of a weapons pricing list ("Weapons List-2"). Weapons List-2 listed the prices and available quantities of ten types of weapons, including multiple models of assault rifles ("AKM" and "AKMC"), "RPG-7" launchers, "ZSU-2" anti-aircraft guns, and "Konkurs" anti-tank missiles. Based on my training, experience, and review of open source materials, I believe that all of the models of weapons identified in Weapons List-2 are of Russian origin.

d.    On or about April 16, 2016, CC-1 informed CS-1, via audio message, that Weapons List-2 had been provided by the prospective seller, and that the prices reflected on Weapons List-2 were "for unofficial deal."

e.    On or about April 17, 2016, during a recorded telephone call, CC-1 and CS-1 discussed arranging a meeting with the seller, whom CC-1 indicated was Russian.

f.    On or about May 4, 2016, CC-1 and CS-1 exchanged text and audio messages. In the course of that exchange, CC-1 sent CS-1 a text message stating that he (CC-1) had "met a man doing weps business" who asked CC-1 "if your [i.e., CS-1's] mexican group can make exchange weps and detergent." CS-1 responded, via audio message, that he/she was unsure of what CC-1 meant. CC-1 sent a text message to CS-1 clarifying: "Cola. Coca Amigo coca." Based on my training, experience, and participation in this investigation, I believe that, in the foregoing exchange, CC-1 was inquiring whether the DTO ("mexican group") was willing to pay for weapons ("weps") by providing cocaine — which CC-1 referred to as "detergent" and then, more explicitly, as "coca."

g.    In or about May 2016, CC-1 sent CS-1, via text message, screenshots of text messages that CC-1 had exchanged with a contact saved in CC-1's cellphone as "Vladimir Russia" — whom I believe, based on my participation in this investigation and the facts discussed in this Complaint, to be VLADIMIR LYUBISHIN, JR., the defendant — in which CC-1 and "Vladimir" discussed selling weapons to the DTO and arranging to meet with representatives of the DTO (i.e., the CSes). The screenshots of the text messages exchanged between CC-1 and "Vladimir" included the following:

i.    CC-1 alluded to the "prices" and "quantities" specified by "Vladimir," and "Vladimir" confirmed that the goods would come from Russia.

ii.    "Vladimir" stated:   "Just talked to the factory.they said they can get a container with most of guns and ammo ready in 3-4 weeks if good adv.payment is paid."

iii.    "Vladimir" stated to CC-1 that he ("Vladimir") would not "feel safe[]" meeting with representatives of the DTO in a particular country "coz its controlled by americans," and then asked CC-1 if "your friends are American agents?"

iv.    After further discussion, "Vladimir" and CC-1 agreed that the meeting would take place in June in Country-2.

v.    "Vladimir" subsequently informed CC-1:   "We ll be there on 22nd."  As discussed below, on or about June 22, 2016, CS-1 and CS-2 met with VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, and CC-1 in Country-2.

### June 22, 2016: Meeting with the Defendants and CC-1

20.   On or about June 22, 2016, at the DEA's direction, CS-1 and CS-2 met in Country-2 with CC-1 and two associates, who were both introduced as "Vladimir" and have since been identified, as described herein, as VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants (the "June 22, 2016 Meeting").  I, along with another DEA agent, conducted surveillance of the June 22, 2016 Meeting, which was audio- and video-recorded.  Based on my review of DEA reports, recordings of the June 22, 2016 Meeting, and a draft transcript of the June 22, 2016 Meeting,[3] and my communications with CS-1 and CS-2, I have learned that the following occurred during the June 22, 2016 Meeting, in substance and in part:

a.    LYUBISHIN, JR. stated that "[CC-1] sent me a list of what you require," which I believe was a reference to Weapons List-1, see supra ¶¶ 16(a), 17(a)(i).  LYUBISHIN, JR. further stated that "we can deliver pretty much everything."

b.    CS-2, posing as a member of the DTO, explained that the weapons acquired in the Weapons Transaction would be used in Mexico.  CS-1 referenced the DTO's importation of drugs into the United States, stating that "when [we] send the guy with a project [i.e., narcotics] from Mexico to the U.S. like

---

[3] The June 22, 2016 Meeting was conducted principally in English. From time to time during the course of the meeting, the LYUBISHINS spoke to each other in Russian, which I do not speak.

always he's carrying a bag [*i.e.*, survival kit] in case he gets shot."

    c.    LYUBISHIN, JR. conveyed that he understood that "you guys [*i.e.*, the CSes] don't have any documents" — that is, that the Weapons Transaction would be illegal.

    d.    CS-1 referred to "the list you send me with the price list, I got from [CC-1]" — that is, Weapons List-2, which the LYUBISHINS had provided to CC-1, who, in turn, sent it to CS-1.  See *supra* ¶¶ 19(c)-(d).  The parties proceeded to discuss the prices reflected on Weapons List-2.

    e.    LYUBISHIN, JR. indicated that the LYUBISHINS conduct at least some of their weapons trafficking business in Country-3 (which is in Europe), stating that "[w]e have a company in [Country-3]."  LYUBISHIN, JR. further conveyed that the LYUBISHINS had access to military-grade weapons both in Country-3 and at warehouses in a particular country in Central America ("Country-5").  It was agreed that the next meeting regarding the Weapons Transaction would take place in Country-3.

**June-July 2016: Meeting and Continued Communications with CC-1**

    21.    Two days later, on or about June 24, 2016, CS-1 met with CC-1, at the DEA's direction, in Country-1 (the "June 24, 2016 Meeting"), and the meeting was audio-recorded.  Based on my review of that recording and DEA reports, and my communications with CS-1, I have learned that the following occurred during the June 24, 2016 Meeting, in substance and in part:

    a.    CS-1 again explained to CC-1 that the DTO's reason for acquiring military-grade weapons was to protect the movement of narcotics from Mexico to the United States.  CS-1 told CC-1 that the DTO's "drugs" are moved "from Mexico through the United States."  CS-1 conveyed that it was "very important" for the DTO to acquire weapons because "[w]ithout weapons, it's fucked," as the DTO's transporters would be "attacked from the government or . . . attacked from the gangsters."

    b.    CC-1 conveyed that he understood, and indicated that "for this" — *i.e.*, acquiring weapons to protect narcotics shipments — the CSes should "continue with the [Country-3] company," which I believe was a reference to VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, who appear to operate a weapons trafficking business based in Country-3, as described herein, see *supra* ¶ 20(e), *infra* ¶¶ 24(f), 28(d)-(e).

22.   Based on my communications with CS-1 and review of DEA reports, consensually recorded telephone calls, and text messages exchanged between CC-1 and CS-1 via the Application, I have learned the following:

a.   In the weeks following the June 24, 2016 Meeting, CC-1 continued communicating with CS-1 about, among other things, the pending Weapons Transaction.

b.   On or about July 7, 2016, during a recorded telephone call, CC-1 and CS-1 negotiated the size of the fee that CC-1 would be paid for his role in the Weapons Transaction.

c.   On or about July 10, 2016, CS-1 informed CC-1 that the CSes were interested in seeing samples of the weapons available for purchase.  CC-1 conveyed that he would relay the CSes' request to the sellers (i.e., VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants).  CC-1 noted that it might not be feasible for the CSes to see samples of "the big ones . . . the missiles."

d.   On or about July 14, 2016, CS-1 informed CC-1 that he/she was busy assisting the DTO with importing narcotics to New York, stating:  "We have some shipments going to New York this week" and "the shipment to New York is very important."

e.   On or about July 13, 2016, CC-1 sent CS-1 a Microsoft Excel spreadsheet (as an attachment to a text message), containing a list of 12 types of military-grade weapons with corresponding prices ("Weapons List-3").  CC-1 indicated that Weapons List-3 had been provided by the LYUBISHINS.  As discussed below, Weapons List-3 was subsequently discussed at a meeting between the LYUBISHINS and the CSes on or about August 2, 2016.  See infra ¶ 24(b).

**August 2, 2016: Meetings with the Defendants**

23.   On or about August 2, 2016, at the DEA's direction, the CSes conducted two meetings with VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, in a particular city ("City-1") in Country-3 (the "August 2, 2016 Meetings").

First Meeting on August 2, 2016

24.   All three CSes met with VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, in the first meeting on August 2, 2016 (the "First August 2, 2016 Meeting"), which was audio- and video-recorded.  Law enforcement personnel from

14

Country-3 conducted surveillance of the First August 2, 2016
Meeting.   Based on my review of DEA reports, recordings of the
First August 2, 2016 Meeting, and a draft transcript and
translation of the First August 2, 2016 Meeting,[4] and my
communications with the CSes, I have learned that the following
occurred at the First August 2, 2016 Meeting, in substance and
in part:

      a.   CS-2 introduced CS-3 to the LYUBISHINS as CS-2's
partner, another member of the Mexican DTO.

      b.   The LYUBISHINS and CSes engaged in a detailed
discussion regarding the prices, quantities, and specifications
of the weapons itemized on Weapons List-3 (i.e., the weapons
list that CC-1 had sent to CS-1 on behalf of the LYUBISHINS, see
supra ¶ 22(e)).   LYUBISHIN, JR. made handwritten notes,
reflecting the terms discussed by the parties, on a copy of
Weapons List-3 that CS-1 had brought to the First August 2, 2016
Meeting.   At the end of the meeting, CS-1 retained the marked-up
copy of Weapons List-3, and later provided it to me.

      c.   In the course of discussing CC-1's role in the
Weapons Transaction, LYUBISHIN, JR. stated that "[CC-1] is our
partner" and "we're working with him."

      d.   The CSes again explained that the DTO was seeking
military-grade weapons, particularly anti-aircraft guns, for the
purpose of protecting shipments of cocaine into the United
States.   For example:

      i.   CS-2 conveyed that the DTO imported "100 kilos"
at a time into the United States, packaged as "blocks . . . of
cocaine."

      ii.   The CSes and LYUBISHINS discussed different
potential methods of transporting hundreds of kilograms of
cocaine across the U.S.-Mexican border, including by aircraft.

      iii.   CS-1 explained that the DTO had a "problem with
the delivery from Mexico to America" and "we don't have enough
to protect our project."   CS-1 further explained that the DTO

---

[4] The First August 2, 2016 Meeting was conducted principally in
English.   From time to time during the course of the meeting,
the LYUBISHINS spoke to each other in Russian.   I have reviewed
preliminary draft translations of portions of the conversations
between the LYUBISHINS.

especially "want the anti-aircraft" to address transport difficulties in Colombia, where "the coca plant is produced."

        iv.   LYUBISHIN, JR. indicated that he understood, and discussed supplying "20-millimeter" or "23-millimeter" anti-aircraft guns to the CSes.

        e.   At various points during the meeting, the LYUBISHINS spoke to each other in Russian (which they understood the CSes not to understand), and discussed, among other things, the specifications of the weapons that they were offering to the CSes and the drug trafficking business of the DTO.  For example:

        i.   CS-2 asked about the model of "AK" assault rifle listed on Weapons List-3.  LYUBISHIN, JR. turned to LYUBISHIN, SR. and asked (in Russian): "AKs — who are the manufacturer and when they were made?"  LYUBISHIN, SR. responded (in Russian): "Soviet AKs . . .  Most likely they were made in 1972 to 1978.  But we can supply new AKs.  It depends on their wish."

        ii.   In the course of discussing the possibility of the DTO using aircraft to transport cocaine into the United States, LYUBISHIN, SR. stated (in Russian) to LYUBISHIN, JR., among other things, that "a helicopter . . . will cost about a million" and "[i]t will take between 200 to 300 kilograms," which I understand, based on my training, experience, and participation in this investigation, to refer to a quantity of narcotics, specifically cocaine.

        iii.   In the course of discussing the "SPG-9" — which I know, based on my training and experience, to be a type of tripod-mounted, anti-tank gun — LYUBISHIN, SR. told LYUBISHIN, JR. (in Russian) that "[t]hey can be transported in a pickup car."  LYUBISHIN, JR. relayed to the CSes, "it can be installed in a jeep."

        f.   LYUBISHIN, JR. informed the CSes that "[w]e have a base here" (*i.e.*, in Country-3).  During the meeting, LYUBISHIN, SR. gave the CSes two business cards (the "Business Cards"), one in Russian, the other in English.  The name on both Business Cards is "Vladimir Lyubishin."  The Business Cards identify a particular company (the "Company"), and provide an address located outside City-1, in Country-3.  CS-3, referencing the Business Cards, asked LYUBISHIN, JR., "[t]his is you, no?"  LYUBISHIN, JR. responded:  "Yes, yes, yes."

g.    The LYUBISHINS and CSes discussed structuring the Weapons Transaction such that the CSes would make an initial payment of $1 million or $2 million to the LYUBISHINS in Country-3, covering weapons that were available at the LYUBISHINS' facilities in Country-3, and that the CSes would subsequently make further payments upon receipt of additional weapons from the LYUBISHINS' facilities in Country-5.

h.    Towards the end of the meeting, the CSes asked the LYUBISHINS to provide an informal invoice or contract reflecting the terms of the Weapons Transaction (the "Term Sheet").  LYUBISHIN, JR. conveyed that he would prepare such a document that day, and it was agreed that the LYUBISHINS would provide the Term Sheet to the CSes at a subsequent meeting that night.

### Second Meeting on August 2, 2016

25.   Later that night (of August 2, 2016), at the DEA's direction, CS-1 and CS-2 met with VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, in City-1 (the "Second August 2, 2016 Meeting").  I, along with another DEA agent, conducted surveillance of the Second August 2, 2016 Meeting, which was audio- and video-recorded.  Based on my review of DEA reports and recordings of the Second August 2, 2016 Meeting,[5] and my communications with CS-1 and CS-2, I have learned that the following occurred at the Second August 2, 2016 Meeting, in substance and in part:

a.    I observed the LYUBISHINS arrive at the Second August 2, 2016 Meeting and engage in conversation with CS-1 and CS-2.  I recognized the LYUBISHINS as the same two individuals whom I had previously observed (with CC-1, CS-1, and CS-2) at the June 22, 2016 Meeting described above.  See supra ¶ 20.

b.    Consistent with the discussion at the close of the First August 2, 2016 Meeting, see supra ¶ 24(h), the LYUBISHINS provided a Term Sheet pertaining to the Weapons Transaction to the CSes.  I have reviewed the Term Sheet, which included the following information:

i.    The Term Sheet stated that the "[Country-3] company" (*i.e.*, the LYUBISHINS' Company) was "ready to sell the

---

[5] The Second August 2, 2016 Meeting was conducted principally in English.  From time to time during the course of the meeting, the LYUBISHINS spoke to each other in Russian.

following goods immediately to [Country-5] military company," and then listed three different types of machineguns (KPVT, SGMT, and PKT) and an anti-aircraft gun (Zu-23-2). As described above, the LYUBISHINS had previously indicated that the DTO's representatives would need to pick up a portion of the purchased weapons from the LYUBISHINS' warehouse in Country-5. See supra ¶ 24(g). Based on my training, experience, and participation in this investigation, I believe that the LYUBISHINS used the term "[Country-5] military company" on the Term Sheet as a cover for the identity of the buyer, which they understood to be the DTO.

        ii.   The Term Sheet indicated that the Country-3 company could also "pre order the following goods," and then listed, among other weapons: "2000 x hand grenades . . . 500 x RPG-7 launcher . . . [and] 30 x Dragunov sniper rifle."

        iii.   The Term Sheet stated that "[a]n advance payment of 1,5 million Euros" would be required for "goods+organization+logistics."

        iv.   The Term Sheet indicated that if the advance payment exceeded the value of the weapons delivered in Country-3, "the [Country-3] company can include other assets as well as up to 10 pieces of BTR-80 Amphibious Armored Personell Carrier . . . as a guarantee for the advance payment."

        v.   The Term Sheet indicated that the Weapons Transaction would include "[o]rganization of the clear root between [Country-3] and [Country-5] companies, acquisition of all documents and legal paper work." Based on my training, experience, and participation in this investigation, I believe that this was a reference to the generation of false documentation, such as end-user certificates, designed to make the illegal sale of weapons appear legitimate.

        vi.   The Term Sheet included a term stating: "[o]rganization of a warehouse and trading facility for future deliveries and cooperation." Based on my training, experience, and participation in this investigation, I believe that this was a reference to the LYUBISHINS' expectation of supplying weapons to the DTO on a continuing basis.

### August 19, 2016: The Defendants Meet with the CSes and Show the CSes Samples of Military-Grade Weapons

    26.   Based on my conversations with CS-1, I have learned that in the weeks following the August 2, 2016 Meetings,

VLADIMIR LYUBISHIN, JR., the defendant, remained in contact with CS-1, and a meeting was arranged for August 19, 2016, in City-1.

27. On or about August 19, 2016, at the DEA's direction, the CSes conducted two meetings with VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, in City-1 (the "August 19, 2016 Meetings").

### First Meeting on August 19, 2016

28. All three CSes met with VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, in the first meeting on August 19, 2016 (the "First August 19, 2016 Meeting"), which was audio- and video-recorded. Law enforcement personnel from Country-3 conducted surveillance of the First August 19, 2016 Meeting. Based on my review of DEA reports and recordings of the First August 19, 2016 Meeting, and my communications with the CSes, I have learned that the following occurred at the First August 19, 2016 Meeting, in substance and in part:

a. The CSes and the LYUBISHINS initially convened at a hotel in City-1.

b. At the outset, CS-1 asked if the LYUBISHINS are "son and father." LYUBISHIN, JR. responded: "Yes."

c. The CSes and the LYUBISHINS again discussed that the weapons supplied by the LYUBISHINS in the Weapons Transaction would be used by the DTO to protect its shipments of cocaine from Mexico into the United States. For example:

i. CS-1 described the DTO as a "cartel of Mexico" involved in "drug trafficking all over the world and especially to America." CS-1 informed the LYUBISHINS that the DTO's most profitable shipments were "to New York."

ii. CS-1 informed the LYUBISHINS that the DTO was "starving for guns," as there was "a war between all the cartels and the U.S. government." CS-1 stated that "from Mexico, we send the loads with the guys, with weapons to secure the loads, . . . to Arizona," and ultimately "to New York," where "the coke" was sold for "between 75 to 70 thousand U.S. dollars" per "ki" (*i.e.*, kilogram). LYUBISHIN, JR. indicated that he understood, and also relayed to CS-1 that LYUBISHIN, SR. was impressed that the DTO was obtaining $70,000 per kilogram.

iii. The CSes and the LYUBISHINS discussed the possibility of the LYUBISHINS acquiring multi-ton quantities of

cocaine from the DTO, through the CSes, for the purpose of
selling the cocaine in Europe.

        d.    The LYUBISHINS invited the CSes to visit their
warehouse outside City-1 ("Warehouse-1"), for the purpose of
viewing weapons.  The LYUBISHINS then drove together to
Warehouse-1 in a car bearing a Country-3 license plate that I
have learned, based on my communications with law enforcement
personnel from Country-3, is registered to VLADIMIR LYUBISHIN,
the defendant.  Warehouse-1 is located at the address listed on
the Business Cards provided by the LYUBISHINS to the CSes at the
First August 2, 2016 Meeting, see supra ¶ 24(f).  At Warehouse-
1, the LYUBISHINS showed the CSes an array of military-grade
weapons.

        e.    Following the visit to Warehouse-1, LYUBISHIN,
JR. showed the CSes additional military-grade weapons at a
second warehouse ("Warehouse-2" and, together with "Warehouse-
1," the "Warehouses"), which was also located outside City-1
(LYUBISHIN, SR. remained at Warehouse-1).  A sign posted on the
property containing Warehouse-2 displayed the name of the
Company (that is, the company identified on the Business Cards
provided by the LYUBISHINS).  The CSes took photographs of the
weapons displayed at the Warehouses, including the following:

Photograph-1



Photograph-2



Photograph-3



Photograph-4



Photograph-5



Photograph-6



      f.    Based on my training, experience, and review of open source materials, I believe that:

         i.    Photograph-1, Photograph-2, and Photograph-3 depict various types of machineguns.

         ii.    Photograph-4 depicts a mortar launcher.

         iii.    Photograph-5 depicts missiles, which appear to be Russian-made air-to-air or air-to-surface missiles.

         iv.    Photograph-6 depicts an amphibious assault vehicle (as referenced in the Term Sheet, see supra ¶ 25(b)(iv).

      g.    In the course of the visits to the Warehouses, the CSes and the LYUBISHINS agreed to reconvene in City-1 later that night to review the terms of the Weapons Transaction.

## Second Meeting on August 19, 2016

29.    Later that night (of August 19, 2016), at the DEA's direction, the CSes met with VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, in City-1 (the "Second August 19, 2016 Meeting").    Law enforcement personnel from Country-3 conducted surveillance of the Second August 19, 2016 Meeting, which was audio- and video-recorded.    Based on my review of DEA reports, recordings of the Second August 19, 2016 Meeting, and a draft transcript and translation of the Second August 19, 2016 Meeting,[6] and my communications with the CSes, I have learned that the following occurred at the Second August 19, 2016 Meeting, in substance and in part:

a.    The LYUBISHINS inquired about the possibility of acquiring multi-ton quantities of cocaine from the DTO, through the CSes, for the purpose of selling the cocaine in Europe.

b.    The LYUBISHINS provided the CSes with an invoice (the "Invoice") reflecting the quantities and prices of weapons that would be sold to the CSes in Country-3 (as described above, the parties contemplated that representatives of the DTO would pick up additional weapons from the LYUBISHINS' warehouse in Country-5 as part of the Weapons Transaction).    I have reviewed the Invoice, which includes the following information:

i.    The Invoice bears the name of the Company associated with the LYUBISHINS.

ii.    The Invoice itemizes three different types of machineguns (Skorpion vz, KPVT, and PKT), and indicates that a total of 5,280 machineguns would be supplied.

iii.    The Invoice states a total price of €2,000,000, and provides bank account information for the Company.

### September and October 2016: The Defendants and CC-1 Remain in Contact with the CSes and the Defendants Agree to Supply Anti-Aircraft Missiles

30.    Based on my communications with CS-1 and CS-3, and my review of consensually recorded telephone calls and text

---

[6] The Second August 19, 2016 Meeting was conducted principally in English.    From time to time during the course of the meeting, the LYUBISHINS spoke to each other in Russian.

messages exchanged via the Application, I have learned the following:

      a.    Since the August 19, 2016 Meetings, CS-1 and CS-3 have remained in contact with VLADIMIR LYUBISHIN, JR., the defendant, and with CC-1, regarding the Weapons Transaction.

      b.    On or about September 16, 2016, CS-1 and CS-3 engaged in a consensually recorded telephone call with LYUBISHIN, JR. (the "September 16, 2016 Call"). In the course of that call, LYUBISHIN, JR. agreed that anti-aircraft missiles would be included in the weapons supplied to the CSes as part of the Weapons Transaction:

      i.    CS-3 asked about the "white missiles" that the CSes had seen at Warehouse-2 (the "Missiles"), which are depicted in Photograph-5 above.

      ii.    LYUBISHIN, JR. advised that the Missiles were either air-to-air or air-to-surface missiles, and that they were "laser-guided and radio-guided." LYUBISHIN, JR. stated that, in preparation for the Weapons Transaction, the Missiles could be electronically tested to ensure they were functioning properly.

      iii.    LYUBISHIN, JR. and the two CSes then discussed surface-to-air missiles, including the "Kvadrat" model. LYUBISHIN, JR. stated that there were "150 pieces" located in a particular country in Eastern Europe, and that he would ascertain whether those missiles were still available.

      iv.    CS-1 explained that the DTO needed anti-aircraft missiles to protect its drug shipments against U.S. helicopters, stating that "here in Mexico, we have really issues with helicopters, with American helicopters . . . bothering us with the trafficking." LYUBISHIN, JR. indicated that he understood the need for anti-aircraft missiles, stating:  "Of course, no problem."

      v.    LYUBISHIN, JR. stated that he would provide a list of missiles available for sale to the CSes.

      vi.    Towards the end of the September 16, 2016 Call, CS-3 asked LYUBISHIN, JR., "how's your dad?" In response, LYUBISHIN, JR. indicated that his father was doing well and that they (the LYUBISHINS) were ready to execute the Weapons Transaction:  "We are just waiting for you guys [i.e., the CSes], because from our side, everything is ready."

24

       c.    Following the September 16, 2016 Call, on or about September 17, 2016, CS-1 and LYUBISHIN, JR. exchanged text messages, including the following:

       i.    LYUBISHIN, JR. sent the following image of a spreadsheet listing different types of air-to-air missiles, air-to-surface missiles, and anti-tank missiles ("Weapons List-4"):



Based on my training, experience, and review of open source materials, I understand that the types of air-to-air missiles listed in Weapons List-4 (*i.e.*, AA-7 Apex and AA-2 Atoll) are equipped with guidance systems (radar or infrared) designed to enable the missiles to seek, proceed towards, and destroy aircraft.

       ii.    Approximately three minutes after sending Weapons List-4, LYUBISHIN, JR. sent a text message to CS-1 stating, in part:  "1st 3 positions we can give as gifts as long as the last two are purchased." Based on my training, experience, and participation in this investigation, I believe that LYUBISHIN, JR. was informing CS-1 that the LYUBISHINS ("we") would be willing to supply the three types of air-to-air missiles identified in Weapons List-4 on a complimentary basis, if the CSes purchased the (more expensive) models of anti-tank and air-to-surface missiles also listed in Weapons List-4.

       iii.    LYUBISHIN, JR. indicated that he remained in contact with CC-1 regarding the Weapons Transaction, and that CC-1 might be growing suspicious:  "[CC-1] told me not to talk to you . . . he told me that he s sniffing smth wrong."

       d.    On or about September 16, 2016, at the DEA's direction, CS-1 and CS-3, while in New York City, engaged in a recorded telephone call with CC-1. In the course of that call, CS-1 advised CC-1 that he/she and CS-3 were in New York "pushing the product," *i.e.*, carrying out the drug trafficking business of the DTO. In the course of discussion regarding the Weapons Transaction, CC-1 stated:  "We are working since one year [ago] . . . . We are ready 100% to close the deal."

WHEREFORE, your deponent respectfully requests that warrants be issued for the arrests of VLADIMIR LYUBISHIN, SR. and VLADIMIR LYUBISHIN, JR., the defendants, and that they be arrested and imprisoned, or bailed, as the case, may be.

MICHAEL CONNOLLY
Special Agent
Drug Enforcement Administration

Sworn to before me this
12th day of October, 2016

THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK